# STATE OF CONNECTICUT v. ANTHONY VAKILZADEN
## (SC 16022)

McDonald, C. J., and Borden, Berdon, Norcott, Katz, Palmer and Peters, Js.[1]

Argued September 21—officially released December 21, 1999

---

[1] This case originally was argued before five justices of this court on April 22, 1999. Subsequent to oral argument, however, the court, sua sponte, ordered supplemental briefs and argument en banc on the supplemental issues: (1) "Is the defendant liable for custodial interference ([General Statutes] § 53a-98) under the circumstances of the present case, where both parents have joint legal custody, but the defendant-parent's physical access is limited to specified visitation, and the defendant deprives the other parent of physical custody of the child?" and (2) "To what extent does *Marshak v. Marshak*, 226 Conn. 652 [628 A.2d 964] (1993), control this case? Should *Marshak* be reconsidered?" Justices Palmer and Peters were added to the en banc panel that heard the case on September 21, 1999, and they read the record, briefs and transcript of the original oral argument.

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *Eugene Callahan*, state's attorney, and *James Bernardi*, senior assistant state's attorney, for the appellant (state).

*Glenn M. Conway*, with whom, on the brief, was *Tara L. Knight*, for the appellee (defendant).

*William H. Narwold, Charles D. Ray* and *Fiona M. Greaves* filed a brief for the Connecticut Women's Education and Legal Fund as amicus curiae.

*Richard L. Albrecht, Gaetano Ferro, Louis I. Parley, Anthony A. Piazza* and *Arnold H. Rutkin* filed a brief for the American Academy of Matrimonial Lawyers as amicus curiae.

*Opinion*

BERDON, J. On December 11, 1997, the defendant, Anthony Vakilzaden, was charged with one count of custodial interference in the first degree in violation of General Statutes § 53a-97 (a) (2) and one count of conspiracy to commit custodial interference in the first degree in violation of General Statutes §§ 53a-48 and 53a-97 (a) (2).[2] The charges arose from a criminal complaint that the defendant aided and abetted his nephew,

---

[2] General Statutes § 53a-48 provides: "Conspiracy. Renunciation. (a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy.

"(b) It shall be a defense to a charge of conspiracy that the actor, after conspiring to commit a crime, thwarted the success of the conspiracy, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

Orang Fabriz, in interfering with the custodial rights of Lila Mirjavadi, the wife of Fabriz, with respect to their child, Saba Fabriz. The defendant moved to dismiss the charges filed against him based on the theory that Fabriz, as the child's father, was a joint custodian of Saba. The trial court granted the defendant's motion to dismiss, relying on this court's decision in *Marshak* v. *Marshak*, 226 Conn. 652, 628 A.2d 964 (1993). The trial court concluded that the state had not demonstrated that Mirjavadi was the sole custodian of the child at the time of the alleged interference.

The state appealed from the judgment of the trial court to the Appellate Court,[3] and we transferred the

General Statutes § 53a-97 provides: "Custodial interference in the first degree: Class D felony. (a) A person is guilty of custodial interference in the first degree when he commits custodial interference in the second degree as provided in section 53a-98: (1) Under circumstances which expose the child or person taken or enticed from lawful custody or the child held after a request by the lawful custodian for his return to a risk that his safety will be endangered or his health materially impaired; or (2) by taking, enticing or detaining the child or person out of this state.

"(b) Custodial interference in the first degree is a class D felony."

General Statutes § 53a-98 provides: "Custodial interference in the second degree: Class A misdemeanor. (a) A person is guilty of custodial interference in the second degree when: (1) Being a relative of a child who is less than sixteen years old and intending to hold such child permanently or for a protracted period and knowing that he has no legal right to do so, he takes or entices such child from his lawful custodian; (2) knowing that he has no legal right to do so, he takes or entices from lawful custody any incompetent person or any person entrusted by authority of law to the custody of another person or institution; or (3) knowing that he has no legal right to do so, he holds, keeps or otherwise refuses to return a child who is less than sixteen years old to such child's lawful custodian after a request by such custodian for the return of such child.

"(b) Custodial interference in the second degree is a class A misdemeanor."

[3] The trial court granted the state permission to appeal pursuant to General Statutes § 54-96, which provides: "Appeals from the rulings and decisions of the Superior Court, upon all questions of law arising on the trial of criminal cases, may be taken by the state, with the permission of the presiding judge, to the Supreme Court or to the Appellate Court, in the same manner and to the same effect as if made by the accused."

appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c). The pivotal issue in this appeal is whether this court should reconsider *Marshak*.

In *Marshak*, the plaintiff wife brought a civil action seeking damages against several defendants for conspiracy to interfere with her custodial rights to her children arising from the defendants' actions in helping her husband remove the children from her custody. Her husband subsequently fled the country with the children. Id., 654–58. On the basis of authority from other jurisdictions and § 700 of the Restatement (Second) of Torts, the trial court found three of the four defendants liable to the plaintiff for having conspired with her husband and for having aided and abetted him to commit the tort of child abduction, and awarded monetary damages to the plaintiff. Id., 660, 662–63. On appeal, we reversed the trial court's judgment, concluding that the defendant[4] was not liable to the plaintiff because the plaintiff's husband had joint legal custody of the children at the time of the alleged acts in question. Id., 666. Joint custody was based wholly on the fact that the parties were still married at the time of the abduction,[5] and that neither party had filed for dissolution of the marriage, nor had they sought any type of court intervention affecting custody. Id., 669. In *Marshak*, we stated that "a factual predicate for any tort related to child abduction . . . is the unlawful custody of a child." Id. Thus, having determined that where joint custody was inferred from their marital status, we reversed the judgment in favor of the plaintiff as there

[4] While the three defendants who were found liable appealed, two of those defendants withdrew their appeal, leaving only one defendant involved in the appeal before this court.

[5] General Statutes § 45a-606 provides in relevant part: "The father and mother of every minor child are joint guardians of the person of the minor, and the powers, rights and duties of the father and the mother in regard to the minor shall be equal. . . ."

could be no unlawful custody at the time of the defendant's actions. Id., 669–70.

*Marshak* may be distinguishable from the present case on the ground that a court order permitting only limited, supervised visitation between a father and a child satisfies the sole custody requirement of *Marshak*. If a parent has sole custody, a person in the position of the defendant, who allegedly assisted the father in the abduction of the child, properly may be charged with the crime of custodial interference.

Although we could reinstate the information against the defendant on that basis, we do not stop there. We conclude that *Marshak* should be overruled, and that the dismissal of the criminal information in the present case was improper on that ground. We therefore reverse the trial court's judgment dismissing the information and remand the case for further proceedings according to law.

It is well settled that when reviewing a motion to dismiss a criminal information, we are required to assess the facts in the light most favorable to the state. See, e.g., *State* v. *Evans*, 205 Conn. 528, 536–37, 534 A.2d 1159 (1987), cert. denied, 485 U.S. 988, 108 S. Ct. 1292, 99 L. Ed. 2d 502 (1988). Accordingly, we set forth the facts that the state had indicated that it would have been able to prove had the case gone to trial. In doing so, however, we focus only on those facts that pertain to the custody of the child.

Mirjavadi and Fabriz, both Iranian citizens, were married in their homeland in 1990. They have one daughter, Saba. In September, 1995, when Saba was one and one-half years old, the family traveled together to the United States on a temporary visa. Mirjavadi and Fabriz separated approximately one month after their arrival in the United States. Mirjavadi retained physical custody of their daughter and moved into her brother's home in

Stamford. Fabriz moved in with his uncle, the defendant, who, at the time in question, was a resident of New Jersey.

Mirjavadi applied for political asylum and, in January, 1996, brought an action for the dissolution of her marriage to Fabriz in the Superior Court for the judicial district of Stamford. On February 5, 1996, a hearing was held on Fabriz's motion seeking visitation rights with Saba. Fabriz notified the court that he was not seeking any form of custody, but, rather, an order of visitation. After making it clear that (1) physical custody of Saba would remain with Mirjavadi and (2) visitation with Fabriz would be supervised based on his risk of flight with Saba and his past abusive behavior, the trial court, *Harrigan, J.*, ordered the parties to consult with the family relations division of the Superior Court and to report back to the court if and when the details of a visitation agreement between the parties had been reached.

That same day, Fabriz and Mirjavadi informed the trial court that they had come to an agreement as to the terms of supervised visitation. The court entered the order for visitation pursuant to their agreement, which allowed Fabriz three hours of supervised visitation per week in the presence of appointed monitors.

On September 30, 1996, Fabriz, while accompanied by the defendant, purchased two one-way tickets to Istanbul, Turkey, for a flight departing from John F. Kennedy Airport in New York on October 5, 1996.[6] The names listed on the tickets were Orang and Saba Fabriz.[7]

---

[6] The defendant was identified by a Turkish Airlines employee as being one of two men who had purchased the two one-way tickets for Fabriz and Saba. The other man identified by the employee was Fabriz himself.

[7] The arrest warrant affidavit for the defendant provides in relevant part: "Friday, Oct[ober] 11, 1996. This date [Sargeant Ralph Romano of the Stamford police department] contacted . . . Turkish Airlines, J.F.K. Airport, New York. For the date of Oct[ober] 5, 1996, their records indicate that

On October 5, 1996, at 2 p.m., Mirjavadi drove Saba to the Stamford Mall to turn Saba over to Fabriz for a regularly scheduled visit supervised by attorney Maria Varone, the appointed monitor. The defendant also was present.

Varone indicated to police that during the visit, Fabriz went into one of the mall stores with Saba while she remained outside the store talking with the defendant. Varone further stated that although she was not sure about the time as she was not wearing a watch, she estimated that between 4:15 and 4:30 p.m., she became concerned as to Fabriz' whereabouts. Fabriz never emerged from the store. Varone and the defendant searched for Fabriz and Saba to no avail. Mirjavadi returned to the mall at the scheduled time of 5 p.m. to retrieve Saba, at which time Varone informed Mirjavadi that Fabriz had disappeared with Saba. Mirjavadi has had no contact with Saba since October 5, 1996.

In *Marshak*, we indicated that recognition of "the tort of child abduction or custodial interference, as applied to either a parent or third party, might well play an important role in encouraging the speedy return of abducted children to the custodial parent . . . ." *Marshak* v. *Marshak*, supra, 226 Conn. 665. Under the facts and circumstances of that case this issue was put off for another day. Today is that day.

The state argues that we should overrule *Marshak* and allow joint custodians to be held criminally liable if, in abducting their own child, their intent is to deprive the other joint custodian of his or her equal parental rights permanently or for a protracted period of time in accordance with General Statutes § 53a-98. We agree that *Marshak* should be overruled and that a joint custodian is not inherently immune from criminal prosecution based solely on his or her status as joint custodian

Orang Fabriz and Saba Fabriz were on flight TK0582 from J.F.K. to Istanbul, Turkey."

if the state can prove all elements of the custodial inter-
ference statute, including both knowledge and intent,
beyond a reasonable doubt.[8]

Although "[t]he doctrine of stare decisis counsels
that a court should not overrule its earlier decisions
unless the most cogent reasons and inescapable logic
require it . . . [t]his court, however, has recognized
many times that there are exceptions to the rule of
stare decisis. . . . Experience can and often does dem-
onstrate that a rule, once believed sound, needs modifi-
cation to serve justice better." (Citations omitted;
internal quotation marks omitted.) *George* v. *Ericson*,
250 Conn. 312, 318, 736 A.2d 889 (1999). "If law is to
have current relevance, courts must have and exert
the capacity to change a rule of law when reason so
requires." (Internal quotation marks omitted.) *Conway*

[8] Although we are concerned with the domestic violence hypothetical
posed by the amicus curiae Connecticut Women's Education and Legal Fund
(CWEALF), we do not agree with its legal conclusions. "CWEALF believes
that adoption of the State's proposed rule places women who want to leave
the family home with their children—because of an abusive husband or an
abusive father—in . . . [a] peculiar position . . . . CWEALF believes that
the state's construction of the custodial interference statute will, in many
cases, eliminate from consideration the mens rea element of the statute."
We disagree. The state is still required to prove, beyond a reasonable doubt,
that the accused (1) intended to hold the child permanently or for a pro-
tracted period of time (2) *knowing* that he had no legal right to do so. See
General Statutes §§ 53a-97 and 53a-98. Although we are sensitive to the
concerns and needs specific to abuse situations, as the amicus points out,
"[parents owe] common-law and statutory duties to their children . . . ."
(Common-law duty to protect and safeguard minor children from harm; see
also Uniform Child Custody Jurisdiction Act, General Statutes § 46b-90 et
seq., which allows emergency custody orders when "it is necessary in an
emergency to protect the child because he has been subjected to or threat-
ened with mistreatment or abuse . . . ." General Statutes § 46b-93 [a] [3]
[B]). Thus, a parent who temporarily "abducts" a child in an effort to safe-
guard that child from an abusive situation, but seeks appropriate legal
redress under § 46b-93 (a) (3) (B) as soon as is feasible under the circum-
stances, could not meet the necessary mens rea for custodial interference
because he or she would have the legal right to take the child to protect
him or her. We are confident that our law enforcement authorities and our
courts will be sensitive to this reality.

v. *Wilton*, 238 Conn. 653, 660, 680 A.2d 242 (1996) (over-ruling rule of law established four years earlier).

In *Marshak* we held that, "[t]he absence of a specific finding by the trial court that the defendant had conspired with or aided the children's father at a time after the father had been stripped of any legal entitlement to custody of the children is fatal to the plaintiff's claim." *Marshak* v. *Marshak*, supra, 226 Conn. 667–68. "The trial court did not find that the defendant had knowingly conspired with the plaintiff's husband . . . or had aided and abetted his actions at a time other than when [the husband] had joint legal custody of the children." Id., 666–67. Quite simply, the legal premise underlying our holding in *Marshak* was faulty. We were wrong to conclude that a joint custodian could never, under any scenario, be liable for custodial interference.

General Statutes § 45a-606 provides in relevant part that "[t]he father and mother of every minor child are joint guardians of the person of the minor, and the powers, rights and duties of the father and the mother in regard to the minor shall be equal. . . ." When one parent purposefully deprives the other joint custodian of their joint lawful custody of the minor child, a de facto sole custody situation is effectively created. Such extrajudicial measures taken by an abducting parent cannot be lawful, and we were wrong to conclude otherwise in *Marshak*.

In reaching this conclusion, we are persuaded by the interpretation of similar statutes in other jurisdictions. In construing its analogous statute, the Maine Supreme Court, in *State* v. *Butt*, 656 A.2d 1225, 1227 (Me. 1995), noted: "In the absence of a court order awarding custody of children, both parents are jointly entitled to their care, custody, and control. . . . Although as a parent, [the defendant husband] had rights of custody in regard to his children, so too did his wife . . . the

mother of those children. [The defendant] can point to no convincing reason or any authority why, absent a court order, [the statute] does not prohibit one parent from depriving the other parent of their legal right to joint custody. [The defendant], after all, deprived [his wife] of any and all contact with the children. . . . Accordingly, the jury was entitled to find that [the defendant] knew that he had no legal right to take . . . his children, and to keep them from their mother." (Citation omitted.)

Similarly, in construing Alaska's custodial interference statutes, that state's Appellate Court posed this question: "Did the Alaska Legislature intend [the statutes] to reach the conduct of a parent whose right to physical custody of the child remains undiminished but whose conduct deprives the other parent of his or her right to custody?" *Strother* v. *State*, 891 P.2d 214, 219 (Alaska App. 1995).[9] That court answered in the affirmative, as do we. "The crime of custodial interference was designed to protect any custodian from deprivation of his or her custody rights—even if that deprivation results from the actions of a person who also has a right to . . . custody of the child. The crime does not focus on the legal status of the defendant, but rather focuses on the defendant's actions, the effect of the defendant's actions, and the intent with which those actions were performed." Id., 220–21.

---

[9] Indeed, the Connecticut legislature addressed a similar concern during its debate on the custodial interference statute. The legislative history supports the supposition that joint custodians are subject to prosecution under the statute. During the legislative debate on the 1995 amendments to the custodial interference statutes, when the word "detaining" was added to subsection (a) (2) of § 53a-97; see Public Acts 1995, No. 95-206, § 1; Representative Dale W. Radcliffe, now a judge of the Superior Court, stated: "It seems to me the situation in which this statute would usually be involved is a situation where a parent, having joint custody, takes a child across the state line." 38 H.R. Proc., Pt. 11, 1995 Sess., p. 4160.

In this case, the state asserts that it will be able to prove that the defendant was present during the family court hearings, he was often present with Fabriz for the supervised visits with Saba, he assisted Fabriz with the purchase of plane tickets to Turkey, he facilitated Fabriz's getaway from the mall the day he took Saba, and he interfered with the police investigation, ensuring that Fabriz was not detained by the police. In short, the state has proffered sufficient evidence with which a jury could find beyond a reasonable doubt that the defendant conspired with Fabriz to deprive Mirjavadi of her lawful joint custody in Saba. Accordingly, in the interest of justice, this court's decision in *Marshak* v. *Marshak*, supra, 206 Conn. 652, is overruled.

The judgment is reversed and the case is remanded for further proceedings according to law.

In this opinion MCDONALD, C. J., and BORDEN, NORCOTT and PALMER, Js., concurred.

KATZ, J., with whom BORDEN and PETERS, Js., join, concurring. I agree with the majority that, to the extent that *Marshak* v. *Marshak*, 226 Conn. 652, 628 A.2d 964 (1993), suggests that a joint custodian, in the absence of a court order depriving him of some or all of his custodial rights, cannot be subject to criminal liability under General Statutes §§ 53a-97 and 53a-98, that case should be overruled. Indeed, I agree that there is nothing in the custodial interference statutes to preclude criminal liability for a joint custodian. Because the trial court in the present case dismissed the charges against the defendant based solely on the fact that the child's father was a joint custodian and is inherently immune from criminal prosecution as a result of that status, I agree with the majority that this court should reverse the trial court's judgment dismissing the criminal charges against the defendant.

I write separately, however, to emphasize that, in addition to the state's argument that a joint custodian may be held criminally liable if, in abducting her own child, her intent is to hold the child permanently or for a protracted period of time, there is another essential element that the state must prove—*knowledge.*

In its briefs to this court, the state seeks, in effect, to create a presumption that a joint custodian knows from the moment a child is born, that she has no legal right to interfere with the custody rights of the other parent. According to the state, "[o]ne joint custodian has no legal right to take a child from the other joint custodian with the intent to hold such child permanently or for a protracted period of time. A joint custodian has no legal right to unilaterally award himself/ herself sole custody of the child, infringing on the legal rights of the other joint custodian." By ignoring the element of knowledge, the state proposes a rule that would allow criminal liability to be imposed upon a joint custodian who infringes upon the other parent's custodial rights but who is merely acting to protect the child. The risk that criminal liability will be imposed upon a parent who takes her child to avoid further abuse to herself or her child is decidedly contrary to the important public policy of this state to "protect children whose health and welfare may be adversely affected through injury and neglect . . . and to make the home safe for all children . . . ." (Internal quotation marks omitted.) *State* v. *Miranda,* 245 Conn. 209, 230 n.23, 715 A.2d 680 (1998); see General Statutes § 17a-101 (a). Moreover, this risk of criminal liability for custodial interference in such circumstances is particularly disturbing in light of the fact that a parent has both common-law and statutory duties to protect or safeguard her minor child from harm. The breach of this duty may expose a parent to criminal liability for assault or risk of injury to her child or, ultimately, could

result in the termination of her parental rights. See id., 215–17 (criminal liability); *In re Lauren R.*, 49 Conn. App. 763, 772–73, 715 A.2d 822 (1998) (termination of parental rights).[1]

In addition, the imposition of criminal liability based upon this presumption of knowledge effectively could limit a parent's rights under both the Uniform Child Custody Jurisdiction Act (UCCJA); General Statutes § 46b-90 et seq.; and the Parental Kidnapping Prevention Act of 1980. 28 U.S.C. § 1738A. A Connecticut court has jurisdiction to make a child custody determination when the child is physically present in the state and "it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent . . . ." General Statutes § 46b-93 (a) (3) (B); see 28 U.S.C. § 1738A (c) (2) (C).[2] The ability of a parent to invoke the salutary purposes of the UCCJA should not be adversely impacted in emergency situations by the threat of criminal liability for custodial interference. In instances in which the UCCJA anticipates the "holding" or "taking" of children, we can hardly presume that the parent acting to protect them knows that she has no legal right to do so.

Although the custodial interference statutes preface liability on the custodial status of the victimized parent,

---

[1] In light of the delicate balance of vital interests involved in this case, I believe that a parent should not be presented with this Hobson's choice. To tell the party being abused that "you're a criminal if you stay and a criminal if you leave" is not a very comforting message to send.

[2] Indeed, under the UCCJA, numerous courts have exercised jurisdiction in "emergency" situations and have in fact altered custody arrangements where parents have kept children beyond permitted visitation periods or have removed children from one state to another to avoid the causes of the "emergency." See *Coleman* v. *Coleman*, 493 N.W.2d 133, 137 (Minn. App. 1992) (children taken from Minnesota to Nebraska not abduction as contemplated by UCCJA); *In the Matter of Vanessa E.*, 190 App. Div. 2d 134, 138, 597 N.Y.S.2d 672 (1993) (petition filed while child visiting mother).

these statutes also focus on the accused parent, *requiring* the state to prove that she intended to hold the child permanently or for a protracted period of time; and that she *knew that she had no legal right to engage in that activity.* See General Statutes §§ 53a-97 and 53a-98. Admittedly, the majority acknowledges this element in footnote 8 of its opinion, but its limited treatment of the very significant issue of domestic violence, addressed by the amicus curiae Connecticut Women's Education and Legal Fund, minimizes the severity of the problem. By treating this problem in so perfunctory a fashion, the court, in effect, lends credence to the state's proposal, which essentially discounts the second mens rea element of the custodial interference statutes.

Knowledge cannot be presumed simply because the accused has a particular custodial status. Therefore, pursuant to §§ 53a-97 and 53a-98, the focus of the issue before the court rightfully must include an assessment of whether the accused knew that she had no right to interfere with the custodial rights of the victimized parent. In other words, the state must prove that the accused acted with the subjective knowledge that her actions constituted custodial interference. Without such a construction, potential liability under the custodial interference statutes would be determined by the fact finder applying his or her own morality, which could be linked to the accused's status as a custodian rather than an assessment of whether the accused legally knew, as that term is defined; see General Statutes § 53a-3 (12); that she had no right to act as she did.

Indeed, if, in any given situation, the controlling consideration is a determination that the accused acted with an awareness that she had no "legal right" to interfere with the custodial rights of the other parent, then joint custody would not be a bar to conviction of a

parent for custodial interference. As the majority opinion points out, legislative history supports the supposition that the crime of custodial interference was designed to protect against all unlawful interruption, even if the deprivation results from actions of a joint custodian. See footnote 9 of the majority opinion.

Rather than impute knowledge by virtue of one's custodial status, the state must prove that the accused *knew* that she had no right to take the child. The onus belongs on the shoulders of the state, by virtue of the statute, to prove knowledge. But a woman who flees the home with her child to avoid physical abuse *cannot* be deemed to have done so knowing that she had no legal right. Moreover, it is not only in an emergency situation that I would presume the defendant's lack of knowledge. Although properly motivated, contained within the state's efforts to make criminal liability easier to impose in abduction cases is the hidden danger that, in order to avoid criminal prosecution, the parent acting to protect the child must wait for an emergency to erupt or for physical harm to occur before she elects to leave the home to avoid the abuse. In addition to making a difficult situation dangerous, at best, and impossible, at worst, such a requirement would put the onus on the parent to justify her actions, in violation both of the statutes as well as common sense.

As the majority opinion makes clear, Orang Fabriz is not inherently immune from criminal prosecution solely on the basis of his status as joint custodian of Saba Fabriz. Therefore, the judgment of the trial court dismissing the charge of custodial interference against the defendant must be reversed, and the state should be given the opportunity to prove that the defendant knew that he had no legal right to interfere with the custodial rights of Lila Mirjavadi, Saba's mother.

PALMER, J., concurring. I join the majority opinion. I also fully agree with the thrust of Justice Katz' concurrence that, in prosecutions under General Statutes §§ 53a-97 and 53a-98, the state bears the substantial burden of proving, as an element of those offenses, that the defendant *had knowledge* that he or she had no legal right to deprive another of that person's custodial rights. In light of the wholly legitimate concerns raised by one of the amici curiae, Connecticut Women's Education and Legal Fund, regarding cases in which a woman is constrained to leave home with her children because of an abusive husband or father, I agree that this point bears emphasis.

I disagree with Justice Katz, however, that the majority opinion "discounts" the importance of the knowledge requirement. See page 669 of the concurring opinion by *Katz, J.* ("[b]y treating [the] problem [of domestic violence cases] in so perfunctory a fashion, the court, in effect, lends credence to the state's proposal, which essentially discounts the [knowledge] element of the custodial interference statutes"). On the contrary, the majority makes clear that the state must prove the element of knowledge beyond a reasonable doubt. See footnote 8 of the majority opinion.