[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
CT Page 8394
The Department of Children and Families (DCF) petitions this court to terminate the parental rights of the respondent mother, Terry M., for failure to rehabilitate from her chronic alcoholism.
The respondent is forty-five years of age. Her parents both were alcoholics. When she was thirteen years old, her mother died in a motor vehicle accident. The respondent then went to live with her grandparents. Two years later they too died and the respondent was placed in foster care by her father. She began drinking alcohol as a teenager. Since that time, the respondent has abused alcohol.
In 1991, the respondent married Charles M. Both spouses were alcoholics and abused alcohol during the marriage. On September 3, 1993, a daughter, Jennifer M., was born to the couple. DCF has been involved with the family since 1993.
During the 1990's the respondent and Charles M. divorced. In early 1999, they were in litigation over custody of Jennifer. In February, 1999, in the course of that litigation, a judge of the Superior Court, sitting in the Family Division, ordered sua sponte that DCF take temporary custody of Jennifer and place her in foster care. It is apparent from the record that the court was concerned about the respondent's alcohol abuse, the condition of the home and the neglect of Jennifer. Jennifer's elementary school had reported that the respondent had come to the school on several occasions smelling of alcohol. Jennifer's school attendance was poor. DCF recommended to the respondent that Jennifer receive counseling. The counselor to whom the respondent was referred reported that the respondent had not followed treatment recommendations for Jennifer or herself. In fact, the respondent kept Jennifer out of school and failed to bring her to counselling when the respondent was having a bad day from the effects of her alcoholism. Jennifer reported that the respondent would drink "juice" that would make her sleep. Her mother, Jennifer complained, "can never wake up and feed me. She never wants to wake up so I can get things in the fridge, sleeps all the time."
on April 13, 1999, DCF formally filed petitions with the Juvenile Division of the Superior Court alleging that Jennifer had been neglected by her parents, both of whom abused alcohol. DCF also filed an application for an order of temporary custody pursuant to General Statutes § 46b-129(b).
On September, 30, 1999, Jennifer was adjudicated a neglected child CT Page 8395 based on the respondent's plea of nolo contenders. She was placed in her father's custody under an order of protective supervision with accompanying orders. The father promptly violated those orders, removing Jennifer without permission to Florida. A DCF social worker was dispatched to Florida to return Jennifer to foster care.
On October 28, 1999, the disposition incident to the earlier neglect adjudication was modified from protective supervision to a commitment to DCF. Since that time, Jennifer has been in foster care.
Since 1999, the respondent has been referred by DCF to several programs for treatment of her alcohol dependence. In March, 1999, after taking custody of Jennifer, DCF referred the respondent to the APT Foundation. The respondent presented herself for the intake interview intoxicated. She was admitted to South Central Rehabilitation Center and completed a detoxification program. She was considered to be in stable condition upon discharge. She was referred to Hallbrook Hospital for in-patient treatment and discharged in May, 1999. While at Hallbrook, the respondent denied that she had a problem with alcohol and claimed that she had not been drunk in many years. Following her discharge from Hallbrook, the respondent failed to comply with recommended aftercare treatment at Yale Psychiatric Institute (YPI)
The respondent next presented for treatment on January 18, 2001, when she again tested positive for alcohol during an evaluation at the Substance Treatment Unit of the APT Foundation (SATU). She did not return for treatment until February 1, 2000. On February 28, 2000, while in treatment, the respondent again tested positive for alcohol but denied use, claiming that the positive result was caused by something she had eaten. Connecticut Mental Health Center referred the respondent "to a higher level of care as she has had several attempts at outpatient treatment at SATU, a recent inpatient treatment at Hallbrook, and appears to not be able to remain abstinent to begin to establish a history of sobriety."
On March 22, 2000, the respondent was admitted to the Chemical Dependency Unit at the Hospital of St. Raphael. She ultimately completed the first phase of that program on May 19, 2000. However, she twice tested positive for alcohol during the program and failed to attend the program's second phase, relapse prevention.
The respondent did not seek services again until February 19, 2001, when she was referred by DCF to Harbor Health Services. Again, the respondent denied that alcohol had impacted her ability to function and minimized her use. Although she was recommended for treatment, the respondent failed to appear for scheduled sessions and was discharged CT Page 8396 from the program.
The respondent continues to abuse alcohol. She also suffers from dysthymia, a generalized anxiety disorder, and a narcissistic personality disorder with obsessive-compulsive personality traits and paranoid features. Psychological testing reveals that the respondent functions "at a very low level of average intellectual reasoning."
On October 4, 2000, DCF filed petitions to terminate the parental rights of both parents. At the time scheduled for trial, the father consented to the termination of his parental rights. The court granted the petition as to the father. The case then proceeded against the respondent.
"Termination of parental rights means the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and the child's parent or parents. . . . Termination of parental rights is a most serious and sensitive judicial action. . . . Since termination of parental rights is the ultimate interference by the state with the natural rights of parents in their children, resulting in everlasting severance of the legal relationship, and usually the permanent separation of parent and child as well, courts must require strict adherence to the statutory standards." (Citations omitted; internal quotation marks omitted.) In re Steven N., 57 Conn. App. 629, 632,749 A.2d 678 (2000).
In a proceeding to terminate parental rights without a parent's consent, brought pursuant to General Statutes § 17a-112, those statutory standards require that DCF prove three elements by clear and convincing evidence: (1) that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds . . . that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing pursuant to subsection (b) of section 17a-110
or section 17a-111b that such efforts are not appropriate," (2) that one or more statutory grounds for termination exist, and (3) that termination of parental rights is in the best interests of the child. General Statutes § 17a-112(c), now § 17a-112(j).
"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial. court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional CT Page 8397 phase, the trial court determines whether termination is in the best interests of the child. . . . It is thus possible for a court to find that a statutory ground for termination of parental rights exists but that it is not in the best interests of the child to terminate the parental relationship, although removal from the custody of the parent may be justified." (Citations omitted; internal quotation marks omitted.) Inre Ashley E., 62 Conn. App. 307, 311-12, 771 A.2d 160, cert. denied,256 Conn. 910, ___ A.2d ___ (2001).
 I
"It is axiomatic that in seeking to terminate parental rights, the commissioner must prove by clear and convincing evidence that the department made reasonable efforts to reunify the parent and child as required by [General Statutes] § 17a-112(c)(1) [now §17a-12(j)(1)]. . . . The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. . . . [R]easonable efforts means doing everything reasonable, not everything possible." (Citations omitted; internal quotation marks omitted.) In re Daniel C., 63 Conn. App. 339, 360-61, ___ A.2d ___ (2001).
In the discharge of its statutory duty to use reasonable efforts to reunify mother and child, DCF offered the following services to the respondent: supervised visitation; parenting classes; family and individual counseling; transportation; intensive family preservation; in-patient and outpatient substance abuse treatment; DCF case management services and foster care,[1] Additionally, when Jennifer was illegally removed to Florida by her father, DCF promptly effected her return to Connecticut. Prior to the filing of the instant petition, the respondent was offered alcohol treatment programs at the Hallbrook Hospital, the APT Foundation, Connecticut Mental Health Center, South Central Rehabilitation Center and the Hospital of St. Raphael.
Since Jennifer was removed from her father's custody in October, 1999, DCF has arranged for the respondent to have supervised visits with her daughter at the Blackstone Library in Branford, Ct. The respondent, who lives in North Branford, suggests that this was an inappropriate setting because Jennifer was distracted from interacting with her mother by computers in the library. A therapist did recommend to DCF that it change the visitation location because Jennifer sometimes did not interact with her mother at the library. DCF disagreed and after a conference between the therapist and DCF, the visitation location was left unchanged.
The court disagrees that visitation at the library was unreasonable. CT Page 8398 DCF was not duty-bound to find a perfect setting for visitation, only a reasonable one. Cf. In re Charles A., 55 Conn. App. 293, 297, 738 A.2d 222
(1999) (even "mistakes . . do not [necessarily] defeat the proposition that reasonable efforts at reunification were made."). The court is unpersuaded that the library was an inappropriate setting. Notably, supervised visitation affords a parent the opportunity to exercise, and for others to observe the exercise of, parental rights. One component of parental rights is the right to control of the child. Castagno v.Wholean, 239 Conn. 336, 342, 684 A.2d 1181 (1996); see also State v.Vakilzaden, 251 Conn. 656, 664, 742 A.2d 767 (1999). There was evidence that the respondent tended to use supervised visits to vent her medical and post-marital problems on the social worker. Also, as discussed infra, Jennifer suffers from an attention deficit disorder. If the respondent was unable to adequately control her daughter so as to maintain her attention, the fault lies not in the library facility, a relatively calm setting for visitation.
The respondent contends that since DCF's plan never was to reunify Jennifer with her mother, reunification efforts were not reasonable. First, this claim is not borne out by the record. Second, General Statutes § 17a-112 does not require that DCF adopt any particular plan. Rather, the statute requires that regardless of its plan, DCF must use reasonable efforts to reunify parent and child. Third, while it is true, as the respondent protests, that "an effort at reunification was never undertaken as to the mother," reunification of Jennifer with the respondent never was a reasonable option. The respondent has never achieved sobriety. Placing Jennifer back in the respondent's custody would have reintroduced her to a physically and emotionally dangerous environment.
To the extent that the respondent challenges the reasonableness of DCF's decision to support vesting custody of Jennifer in her father on September 30, 1999, she is collaterally estopped from doing so. "Collateral estoppel, or issue preclusion, prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action. . . . For an issue to be subject to collateral estoppel, it must have been fully and fairly litigated in the first action. It also must have been actually decided and the decision must have been necessary to the judgment. . . . Furthermore, [t]o invoke collateral estoppel the issues sought to be litigated in the new proceeding must be identical to those considered in the prior proceeding. . . .
"An issue is actually litigated if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined. . . . 1 Restatement (Second), Judgments § 27, comment (d) CT Page 8399 (1982). An issue is necessarily determined if, in the absence of a determination of the issue, the judgment could not have been validly rendered. F. James G. Hazard, Civil Procedure (3d Ed. 1985) § 11.19." (Internal quotation marks omitted.) R R Pool Patio v. ZoningBoard, 60 Conn. App. 82, 91-92, 758 A.2d 462, cert. granted, 255 Conn. 902,762 A.2d 909 (2000). The issue of custody of Jennifer was actually litigated since it was submitted for determination by the neglect petition and by virtue of General Statutes § 46b-129(j). General Statutes § 46b-129(j) provides: "Upon finding and adjudging that any child . . . is . . . neglected . . . the court may vest such child's . . . care and personal custody . . . with any person or persons found to be suitable and worthy of such responsibility by the court." Moreover, there is no question but that the issue of custody was actually and necessarily determined.
"The guiding principal in determining custody is the best interests of the child. . . ." (Internal quotation marks omitted.) In re Shyina B.,58 Conn. App. 159, 167, 752 A.2d 1139 (2000). "[I]n deciding what is in the best interest of the child, the court is vested with broad discretion. . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonablyconclude as it did." (Emphasis added; internal quotations marks omitted.)In re Alexander C., 60 Conn. App. 555, 559, 760 A.2d 532 (2000). Since the respondent is estopped from collaterally attacking the reasonableness of the court's decision vesting custody of Jennifer in her father, neither can she, without more and on this record, challenge the reasonableness of DCF's plan that the court do so.
The court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the respondent and her daughter as required by General Statutes § 17a-112.
 II
In an amendment to its petition, DCF claims that the respondent abandoned Jennifer. "Abandonment focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment. . . . General Statutes § 17a-112(b)(1) . . . defines abandonment as the fail[ure] to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . . Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. . . . CT Page 8400
"Section 17a-112(b)(1) does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child. A parent must maintain a reasonable degree of interest in the welfare of his or her child. Maintain implies a continuing, reasonable degree of concern." . . .
"The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." (Internal quotation marks omitted.) In re Deana E., 61 Conn. App. 185,193, 763 A.2d 37 (2000).
Although the respondent failed to consistently visit Jennifer in 1999, since January, 2000, she has been consistent with her visitation. Moreover, the respondent consistently professes her love for Jennifer during these visits. There is no other evidence that the respondent has abandoned her daughter. Specifically, there is no persuasive evidence that the respondent has not made telephone calls to her daughter, sent her cards and gifts, or financial support. Although the respondent elected not to testify at trial, the petitioner must prevail, if at all, not by reason of the weakness of the respondent's case but because of the strength of its own. Nikitiuk v. Pishtey, 153 Conn. 545, 553, 219 A.2d 225
(1966). The court finds that the petitioner has failed to sustain its burden of proof that the respondent has abandoned her daughter.
 III
The principal ground of the petition is that since the commitment of her daughter, the respondent has failed to achieve rehabilitation. By clear and convincing evidence, the court finds that this ground has been proven.
"Failure of a parent to achieve sufficient personal rehabilitation is one of six statutory grounds on which a court may terminate parental rights pursuant to § 17a-112. General Statutes [(Rev. to 1999) §17a-112(c)(3)(B) . . . [now (j)(3)(B)]. That ground exists when a parent of a child whom the court has found to be neglected fails to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, the parent could assume a responsible position in the life of that child. CT Page 8401
"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he] can assume a responsible position in [his] child's life. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [his] ability to manage [his] own life, but rather whether [he] has gained the ability to care for the particular needs of the child at issue. . . ." (Citations omitted; internal quotation marks omitted.) Inre Sheila J., 62 Conn. App. 470, 479-80, 771 A.2d 244 (2001). "An inquiry regarding personal rehabilitation requires us to obtain a historical perspective of the respondent's child-caring and parenting abilities." Inre Stanley D., 61 Conn. App. 224, 231, 763 A.2d 83 (2000).
"Pursuant to Practice Book § 33-3(a), in deciding the adjudicatory phase of the hearing for the termination of parental rights, the trial court's inquiry is limited to the events and facts preceding the filing of the petition for the termination of parental rights." In re DanielC., supra, 63 Conn. App. 357. However, "[i]n the adjudicatory phase, the court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Emphasis in original.) In re Stanley D., supra, 61 Conn. App. 230.
The respondent suffers from dysthymia and a generalized personality disorder marked by a lack of taking responsibility for her actions, blaming others for her condition, and a notion of entitlement, regardless of the lack of any effort on her part. She is unable to understand and fully comprehend the effect of her own life decisions on her daughter's welfare and misinterprets her daughter's behavior. Her discipline of her daughter, when she was in a position to discipline her, has itself been immature: yelling, screaming and crying.
However, her underlying problem is alcohol dependency and abuse. The respondent continues to be a chronic abuser of alcohol, as she has been for many years. At the time of the filing of the instant petition, on October 4, 2000, she was no closer to dealing with her alcohol dependence than she was when Jennifer was removed from her care in 1999. The respondent admits that she drinks, but she denies that she is addicted or that her alcohol abuse adversely effects her behavior. CT Page 8402
Although the respondent is able to maintain her apartment as well as her appearance and hygiene, personal rehabilitation, as observed supra, refers to the reasonable foreseeability of the restoration of a parent to his or her former constructive and useful role as a parent, not merely the ability to manage his or her own life. In re Ashley S.,61 Conn. App. 658, 665, 769 A.2d 718, cert. denied, 255 Conn. 950,769 A.2d 61 (2001). The ability of the respondent to assume a constructive role in her daughter's life continues to be undermined by her alcohol abuse. The respondent has missed visits with her daughter and has appeared for visits with alcohol on her breath. At times she is unable to appropriately interact with Jennifer, who has memories of her mother drinking and always falling asleep. The respondent's alcohol abuse has seriously impaired her ability and motivation to supervise Jennifer. Jennifer is now 7 1/2 years old and has been diagnosed by Dr. Logan Green as having Attention Deficit Hyperactivity Disorder (ADHD), and "a fair amount of depressive effect along with some level of anxiety."[2] The respondent's behavioral anomalies accompanying her alcohol abuse are detrimental to Jennifer's sense of well-being.
With respect to whether the respondent's rehabilitation is foreseeable within a reasonable time, the court further finds that, subsequent to the filing of this petition, the respondent was unfavorably discharged from a substance abuse program at Harbor Health Services, Inc. In his report, Dr. Logan Green, Ph.D., the court-appointed expert who performed a psychological evaluation on the respondent, opined that "there was very little reason to believe that rehabilitation of [the respondent] would occur in much less than five years." "The psychological testimony from professionals is rightly accorded great weight in termination proceedings." (Internal quotation marks omitted.) In re John G.,56 Conn. App. 12, 24, 740 A.2d 496 (1999).
The present case is analogous to In re Kristina D., 51 Conn. App. 446,721 A.2d 1256 (1999), and In re Kasheema L., 56 Conn. App. 484, 486-87,744 A.2d 441 (1999), cert. denied, 252 Conn. 945, 747 A.2d 522 (2000). InIn re Kristina D., the respondent was an active drug abuser who entered many substance abuse and mental health programs, but relapsed after each attempt. The trial court held that the respondent was an unrecovered, active alcoholic and substance abuser, impaired to such an extent that she was unable to provide for the care and custody of her children and, thus, had failed to achieve personal rehabilitation. The Appellate Court affirmed. In re Kristina D., supra, 51 Conn. App. 451. Similarly, in Inre Kasheema L., the respondent attended five drug abuse programs prior to the filing of the petition and relapsed after completing each of them. Subsequent to the filing of the petition, the respondent completed another program and had since remained drug free. She also had married CT Page 8403 and secured employment. However, the trial court found that "the respondent failed to attend some visits with her children and did not attend scheduled classes to help her with her deficits. The trial court, therefore, found that the respondent had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the needs and ages of the children, she could assume a responsible position in their lives." In re Kasheema L., supra, 56 Conn. App. 486-87. The Appellate court affirmed, noting that although the respondent had achieved a degree of personal rehabilitation, her "sobriety was too fragile." Id., 489.
By clear and convincing evidence, the court finds that Jennifer has previously been adjudicated neglected and that the respondent has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering Jennifer's age and needs, the respondent could assume a responsible position in her daughter's life.
The court turns to the question of what disposition would be in Jennifer's best interests.
 IV
"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of . . . parental rights is not in the best interests of the child." (Internal quotation marks omitted.) In re Ashley E., supra, 62 Conn. App. 315. "In arriving at that decision, the court is mandated to consider and make written findings regarding seven factors delineated in General Statutes [(Rev. to 1999) § 17a-112 (d) [now § 17a-112(k)]]." (Footnote omitted.) Inre Deana E., supra, 61 Conn. App. 190.
 A. (Mandatory Findings) 1. Finding regarding the timeliness, nature and extent of servicesoffered, provided, and made available to the parent and the child by achild-placing agency to facilitate the reunion of the child with theparent.
Soon after Jennifer was removed from her custody the respondent was offered appropriate services to deal with her chronic alcohol abuse and to facilitate her reunion with her daughter. Specifically, the respondent was offered visitation with her daughter; parenting classes; family and individual counseling; transportation; intensive family preservation; in-patient and outpatient substance abuse treatment; case management CT Page 8404 services, and foster care.[3] When Jennifer's father illegally removed her to Florida, DCF promptly effected her return to Connecticut. Prior to the filing of the instant petition, the respondent was offered alcohol treatment programs at the Hallbrooke Hospital, the APT Foundation, Connecticut Mental Health Center, South Central Rehabilitation Center and the Hospital of St. Raphael.
The court finds that DCF timely offered extensive services to the respondent to facilitate her reunion with her daughter.
2. Finding regarding whether DCF has made reasonable efforts to reunitethe family pursuant to the Federal Child Welfare Act of 1980, asamended.
The court finds by clear and convincing evidence that DCF made reasonable efforts to reunite the family. DCF has repeatedly referred the respondent to programs to address her underlying problem of alcohol abuse. In other respects, as well, the case reflects good social work.
3. Finding regarding the terms of any applicable court order enteredinto and agreed upon by any individual or child-placing agency and theparent, and the extent to which all parties have fulfilled theirobligations under such order.
On September 30, 1999, the court ordered the following steps for the mother: participate in individual and parenting counseling and make progress towards the identified treatment goals, including long-term substance abuse treatment; submit to substance abuse assessment and follow recommendations regarding treatment; successfully complete substance abuse treatment including inpatient treatment if necessary and follow recommendations regarding aftercare treatment, including relapse prevention; follow recommendations of service providers (referral through ABH); do not engage in substance abuse; keep all appointments set by or with DCF; cooperate with DCF home visits, announced and unannounced, and visits by the child's attorney.
The respondent was inconsistent with visitation during 1999. Since January 4, 2000, however, she has visited Jennifer consistently. She has kept her whereabouts known to DCF her attorney and Jennifer's attorney.
With respect to the requirement that the respondent submit to substance abuse assessment and follow aftercare recommendations, the following statements from the August 1, 2000 social study are uncontroverted: "DCF has made numerous referrals for substance abuse treatment for [the respondent]. [The respondent] arrived at APT Foundation on March 24, 1999, intoxicated. [She] was admitted to Merritt Hall for detoxification CT Page 8405 and then transferred to Hallbrook Hospital for substance abuse treatment and depression. On May 3, 1999, [the respondent] left the program with YPI and Harbor Health in place for continued treatment. [She] failed to comply with these recommendations. Not until January 18, 2000, did [she] engage again in treatment. She went to SATU for a triage evaluation and provided a positive breathalyzer for alcohol. She did not return until February 1, 2000. On March 22, 2000, [the respondent] was admitted to the Chemical Dependency Unit, Substance Abuse Services, St. Raphael's Hospital. She attended more than half of her sessions. On May 19, 2000, she graduated the five-day a week program and was referred on for Relapse Prevention, which meets once, a week. [She] tested positive for alcohol twice during that time. [She] did not show for her first evening of Relapse Prevention." Since the date of the social study the respondent has failed to successfully complete any alcohol treatment program.
The respondent, however, has cooperated with DCF with respect to the signing of releases and has maintained adequate housing. Her income is derived from Social Security Disability payments, her disability being alcoholism. She continues to abuse alcohol but has had no involvement with the criminal justice system.
4. Finding regarding the feelings and emotional ties of the child withrespect to the child's parents, any guardian of the child's person andany person who has exercised physical care, custody or control of thechild for at least one year and with whom the child has developedsignificant emotional ties.
Jennifer has a close and loving relationship with both her mother and father, although she is understandably afraid to be in their care. The following discussion of the interaction between Jennifer and each of her parents, contained in the January 5, 2001 psychological report of Dr. Logan Green, Ph.D., the court-appointed psychologist, is especially revealing: "Jennifer and each of her parents were able to relax and be comfortable with each other. . . . Jennifer's mother and father were accepting and affectionate toward her as she was toward each of them. Jennifer talked to each of them nicely and engagingly and they did to her. A difference here is that Jennifer appeared more subdued for awhile (about 20 minutes) with her mother than she was with her father. However, she acted just as closely and held her mother just as frequently as she held her father. Jennifer's behavior when she was with each of her parents was good and she played easily. She got into the task that I gave them as did each of her parents. The level of play . . . was appropriate. Control used by each of the parents included kindness and directness. However, there was not much need for control since Jennifer did what she was asked. They were all able to talk about issues in a humorous manner. While Jennifer was with her mother, they were talking CT Page 8406 about how new teeth were growing in. Then, out of the blue, Jennifer said `I love you.' She then ran to her mother and hugged her and her mother hugged her also. She acted in some similar ways toward her father but not this dramatically. In general, then, affective involvement between Jennifer and each of her parents showed, respect, warmth, and revealed a fair amount of intimacy. She had no trouble holding her parents nor did they her. Closeness was permitted and indeed rewarded."
Jennifer also had a warm and loving relationship with her former foster family, with whom she lived for twenty-two months. Unfortunately, she was required to leave that home five weeks before trial because the foster father experienced a health crisis. As a consequence of this move, Jennifer is also losing the individual counselor she has had for a long period of time.
The court is not persuaded that her relationship with her new foster family has yet achieved any meaningful quality.
5. Finding regarding the age of the child.
Jennifer was born on September 1993. She is now 7 1/2.
6. Finding regarding the efforts the parent has made to adjust suchparent's circumstances, conduct or conditions to make it in the bestinterest of the child to return the child to the parent's home in theforeseeable future, including, but not limited to: (A) the extent towhich the parent has maintained contact with the child as part of aneffort to reunite the child with the parent; provided the court may giveweight to incidental visitations, communications or contributions, and(B) the maintenance of regular contact or communication with the guardianor other custodian of he child.
Despite her referral to and attendance at several alcohol abuse programs, the respondent has failed to come to grips with her alcohol abuse. She denies that alcohol is a problem or causes problems in her life. As Dr. Green testified, the respondent is in the "pre-contemplative stage" of sobriety. In layman's terms, she is not yet seriously thinking of staying sober. Her abuse of alcohol, a depressant which causes illogical thinking, subverts her ability to parent Jennifer. As Dr. Green also reported, the respondent is impulsive and has poor parenting skills.
However, since the beginning of 2000, the respondent has maintained fairly consistent contact with her daughter, and generally appropriate in that contact, and has remained in contact with DCF. CT Page 8407
7. Finding regarding the extent to which a parent has been preventedfrom maintaining a meaningful relationship with the child by theunreasonable act or conduct of the other parent of the child, or theunreasonable act of any other person or by the economic circumstances ofthe parent.
In October, 1999, Jennifer's father unlawfully removed her from Connecticut, thereby preventing her mother from having contact with her. Jennifer was returned by DCF to Connecticut later that month. Since that time, the respondent has not been prevented from maintaining a meaningful relationship with Jennifer by the unreasonable act or conduct of Jennifer's father, or the unreasonable act of any other person or by her economic circumstances.
 B.
Although in determining whether to grant a petition to terminate parental rights the court is statutorily mandated to consider seven factors; General Statutes (Rev. 1999) § 17a-112(d), now §17a-112(k); In re Tyscheicka H., supra, 61 Conn. App. 26; "[t]he trial court is vested with broad discretion in determining what is in the child's best interests. . . . Conducting a best interest analysis is . . . purposefully broad to enable the trial court to exercise its discretion based upon a host of considerations." (Citations omitted; internal quotation marks omitted.) In re Alissa N., 56 Conn. App. 203, 208,742 A.2d 415 (1999), cert. denied, 252 Conn. 932, 746 A.2d 791 (2000). Notably, General Statutes (Rev. 1999) § 17a-112(i), now §17a-112(p), expressly provides that its provisions "shall be liberally construed in the best interests of any child for whom a petition under this section has been filed." "The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment." (Internal quotation marks omitted.) In re Shyina B., supra, 58 Conn. App. 167.
The loss of both her foster family of twenty-two months and her therapist of long-standing is a considerable loss for a little girl, 7 1/2 years old, whose life already has been tumultuous enough. Thus, at the time of trial, Jennifer's life was in a state of considerable instability. As Dr. Green acknowledged, Jennifer's loss of her mother, as a result of the termination of her mother's parental rights, would have a deleterious effect on Jennifer. Although Dr. Green did recommend that the respondent's parental rights be terminated, he also antithetically recommended that "continued contact with the biological parents ought to be considered[,] especially if they are rehabilitating and reliable and appropriate in contact with her." It is unclear whether Dr. Green recommended the immediate rather than eventual termination of parental CT Page 8408 rights.
Moreover, whether the present placement was likely to result in adoption, long-term foster care or some less suitable result is unclear. It is true that "[a]lthough subsequent adoption is the preferred outcome for a child whose biological parents have had their parental rights terminated . . . it is not a necessary prerequisite for the termination of parental rights." (Citations omitted.) In re Eden F., 250 Conn. 674,709, 741 A.2d 873, rehearing denied, 251 Conn. 924, 742 A.2d 364 (1999). "While long-term stability is critical to a child's future health and development . . . adoption provides only one option for obtaining such stability." (Citation omitted.) Id. So too, of course, that a bond exists between parent and child does not require that a petition to terminate parental rights be denied. In re Quanitra M., 60 Conn. App. 96, 105-107,758 A.2d 863, cert. denied, 255 Conn. 903, 762 A.2d 909 (2000).
However, the court finds that DCF has not proven by clear and convincing evidence that termination of the respondent's parental rights is in Jennifer's best interests. "[W]hether termination of parental rights is appropriate must be decided upon the basis of conditions as they appear at the time of trial. . . ." In re Brianna F.,50 Conn. App. 805, 813, 719 A.2d 478 (1998). At this time of uncertainty and instability in her life, Jennifer needs the love of her mother and contact with her, even though the respondent may not be rehabilitating. Total removal of her mother from her life at this time would unnecessarily compound her emotional losses and sense of instability. "For a child whose future is uncertain . . . the more people who know about her and care concerned about her, the better. . . ." (Internal quotation marks omitted.) In re Alissa N., supra, 56 Conn. App. 211. Notably, since early 2000, the respondent has been fairly consistent with her visitation, and the instances where, in the past, she appeared with an odor of alcohol have been rare.
Should the current placement succeed beyond the "honeymoon period,"[4]
and the present foster parents prove willing to adopt Jennifer, or if termination is otherwise in Jennifer's best interests, DCF, of course, may again petition to terminate the respondent's parental rights if it may prove the statutory requirements for termination. The doctrines of res judicata and collateral estoppel do not bar a subsequent petition to terminate parental rights; In re Juvenile Appeal (83-DE), 190 Conn. 310,318-19, 460 A.2d 1277 (1983); see also In re Brianna F., supra,50 Conn. App. 814; and evidence of events and records of this proceeding may be introduced in such a proceeding. In re John B., 20 Conn. App. 725,731-32, 570 A.2d 23 (1990). However, if it does not appear that Jennifer will be adopted, and that long-term foster care is her most viable alternative, termination of the respondent's parental rights still may CT Page 8409 not be in Jennifer's best interests. See In re Alissa N., supra,56 Conn. App. 211 n. 5.
DCF shall continue to afford the respondent supervised visitation if she exercises that visitation with reasonable consistency and is appropriate and alcohol-free during visits. Unless a finding is made pursuant to General Statutes §§ 17a-110, 46b-129 that it is no longer appropriate to continue efforts to reunify the respondent and her daughter, DCF shall refer the respondent to an in-patient dual diagnosis program to treat the respondent's alcohol dependency and her mental health issues. The respondent shall participate in and cooperate with such a program, including aftercare recommendations.
The petition is dismissed.[5]
BY THE COURT
Bruce L. Levin Judge of the Superior Court