STATE OF CONNECTICUT *v.* ANTHONY
VAKILZADEN
(SC 17246)

Borden, Norcott, Katz, Palmer and Zarella, Js.

Argued November 23, 2004—officially released February 15, 2005

*Susan C. Marks*, supervisory assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, *Leon F. Dalbec, Jr.*, senior assistant state's attorney, and *James Bernardi*, supervisory assistant state's attorney, for the appellant (state).

*Glenn M. Conway*, with whom, on the brief, were *E. Gregory Cerritelli* and *Tara L. Knight*, for the appellee (defendant).

*Opinion*

NORCOTT, J. This is the state's second appeal[1] from the judgment of the trial court granting the motion

---

[1] The trial court granted the state permission to appeal pursuant to General Statutes § 54-96, which provides: "Appeals from the rulings and decisions of the Superior Court, upon all questions of law arising on the trial of criminal cases, may be taken by the state, with the permission of the presiding judge, to the Supreme Court or to the Appellate Court, in the same manner

of the defendant, Anthony Vakilzaden, to dismiss an information charging him with one count of custodial interference in the first degree in violation of General Statutes § 53a-97,[2] and one count of conspiracy to commit custodial interference in the first degree in violation of General Statutes §§ 53a-48[3] and 53a-97 (a) (2). The charges arose from allegations that the defendant had aided and abetted his nephew, Orang Fabriz, in interfering with the custodial rights of Fabriz' wife, Lila Mirjavadi, with respect to their child, Saba Fabriz (Saba). The state claims that the trial court improperly concluded that the defendant was deprived of his due process right to fair notice as a result of this court's decision in *State* v. *Vakilzaden*, 251 Conn. 656, 742 A.2d 767

and to the same effect as if made by the accused." The state then appealed from the judgment of dismissal to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] General Statutes § 53a-97 provides: "(a) A person is guilty of custodial interference in the first degree when he commits custodial interference in the second degree as provided in section 53a-98: (1) Under circumstances which expose the child or person taken or enticed from lawful custody or the child held after a request by the lawful custodian for his return to a risk that his safety will be endangered or his health materially impaired; or (2) by taking, enticing or detaining the child or person out of this state.

"(b) Custodial interference in the first degree is a class D felony."

General Statutes § 53a-98 (a) provides: "A person is guilty of custodial interference in the second degree when: (1) Being a relative of a child who is less than sixteen years old and intending to hold such child permanently or for a protracted period and knowing that he has no legal right to do so, he takes or entices such child from his lawful custodian; (2) knowing that he has no legal right to do so, he takes or entices from lawful custody any incompetent person or any person entrusted by authority of law to the custody of another person or institution; or (3) knowing that he has no legal right to do so, he holds, keeps or otherwise refuses to return a child who is less than sixteen years old to such child's lawful custodian after a request by such custodian for the return of such child."

[3] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

(1999), to overrule *Marshak* v. *Marshak*, 226 Conn. 652, 628 A.2d 964 (1993), upon which the defendant had relied in *Vakilzaden*. We reverse the judgment of the trial court.

Our opinion in *Vakilzaden* sets forth the following relevant facts and procedural history. "Mirjavadi and Fabriz, both Iranian citizens, were married in their homeland in 1990. They have one daughter, Saba. In September, 1995, when Saba was one and one-half years old, the family traveled together to the United States on a temporary visa. Mirjavadi and Fabriz separated approximately one month after their arrival in the United States. Mirjavadi retained physical custody of their daughter and moved into her brother's home in Stamford. Fabriz moved in with his uncle, the defendant, who, at the time in question, was a resident of New Jersey.

"Mirjavadi applied for political asylum and, in January, 1996, brought an action for the dissolution of her marriage to Fabriz in the Superior Court for the judicial district of Stamford. On February 5, 1996, a hearing was held on [Fabriz'] motion seeking visitation rights with Saba. Fabriz notified the court that he was not seeking any form of custody, but, rather, an order of visitation.[4] After making it clear that (1) physical custody of Saba would remain with Mirjavadi[5] and (2) visitation with

---

[4] The following are excerpts from the February 5, 1996 hearing:

"The Court: All right. Well, there's no order of custody, but you're moving for an order of visitation? . . .

"[Fabriz' Attorney]: At this point, all we want is the father has not seen the child, been permitted to see the child, in four months, and—

* * *

"The Court: Well, all he wants is visitation.

"[Mirjavadi's Attorney]: And we're willing to give him supervised visitation without hesitation, Your Honor."

[5] The defendant correctly points out that the family court never explicitly made a determination with respect to the custody of Saba. Instead, it entered a *temporary* order of limited, supervised *visitation* in favor of Fabriz. The very limited nature of Fabriz' visitation rights, as well as the trial court's

Fabriz would be supervised based on his risk of flight with Saba and his past abusive behavior, the trial court, *Harrigan, J.*, ordered the parties to consult with the family relations division of the Superior Court and to report back to the court if and when the details of a visitation agreement between the parties had been reached.

"That same day, Fabriz and Mirjavadi informed the trial court that they had come to an agreement as to the terms of supervised visitation. The court entered the order for visitation pursuant to their agreement, which allowed Fabriz three hours of supervised visitation per week in the presence of appointed monitors.

"On September 30, 1996, Fabriz, while accompanied by the defendant, purchased two one-way tickets to Istanbul, Turkey, for a flight departing from John F. Kennedy Airport in New York on October 5, 1996.[6] The names listed on the tickets were Orang and Saba Fabriz.[7]

"On October 5, 1996, at 2 p.m., Mirjavadi drove Saba to the Stamford Mall to turn Saba over to Fabriz for a regularly scheduled visit supervised by attorney Maria Varone, the appointed monitor. The defendant also was present.

"Varone indicated to police that during the visit, Fabriz went into one of the mall stores with Saba while

comment that "[t]he baby's going to be with her," indicate that Mirjavadi was awarded sole *physical* custody of her daughter.

[6] "The defendant was identified by a Turkish Airlines employee as being one of two men who had purchased the two one-way tickets for Fabriz and Saba. The other man identified by the employee was Fabriz himself." *State* v. *Vakilzaden*, supra, 251 Conn. 661 n.6.

[7] "The arrest warrant affidavit for the defendant provides in relevant part: 'Friday, Oct[ober] 11, 1996. This date [Sergeant Ralph Romano of the Stamford police department] contacted . . . Turkish Airlines, J.F.K. Airport, New York. For the date of Oct[ober] 5, 1996, their records indicate that Orang Fabriz and Saba Fabriz were on flight TK0582 from J.F.K. to Istanbul, Turkey.' " *State* v. *Vakilzaden*, supra, 251 Conn. 661 n.7.

she remained outside the store talking with the defendant. Varone further stated that although she was not sure about the time as she was not wearing a watch, she estimated that between 4:15 and 4:30 p.m., she became concerned as to Fabriz' whereabouts. Fabriz never emerged from the store. Varone and the defendant searched for Fabriz and Saba to no avail. Mirjavadi returned to the mall at the scheduled time of 5 p.m. to retrieve Saba, at which time Varone informed Mirjavadi that Fabriz had disappeared with Saba. Mirjavadi has had no contact with Saba since October 5, 1996." *State* v. *Vakilzaden*, supra, 251 Conn. 660–62.

The state subsequently charged the defendant with one count of custodial interference in the first degree in violation of § 53a-97 and one count of conspiracy to commit custodial interference in the first degree in violation of §§ 53a-48 and 53a-97 (a) (2), for his role in the incident. The defendant moved to dismiss the information on the basis of Fabriz' relationship to Saba as her joint legal custodian and this court's holding in *Marshak* v. *Marshak*, supra, 226 Conn. 667–68, that "[t]he absence of a specific finding by the trial court that the defendant had conspired with or aided the children's father at a time after the father had been stripped of any legal entitlement to custody of the children is fatal to the [mother's] claim." The trial court thereafter concluded that the state had failed to prove that Mirjavadi had sole custody of Saba, and granted the defendant's motion to dismiss based on this court's holding in *Marshak*.

The state then appealed from the judgment of dismissal to this court. In *State* v. *Vakilzaden*, supra, 251 Conn. 660, we reversed the judgment of the trial court and remanded the case, concluding "that [the] court order permitting only limited, supervised visitation between a father and a child satisfie[d] the sole custody requirement of *Marshak*." We also, however, overruled

*Marshak*, concluding that it had been based on a faulty premise. Id., 666.

Upon remand to the trial court, the defendant again moved to dismiss the charges against him, claiming that the reinstatement of his prosecution would violate the ex post facto clause of the constitution of the United States, article one, § 10,[8] as well as his right to fair notice as guaranteed by the due process clause of the fourteenth amendment to the United States constitution[9] and the due process clause of the constitution of Connecticut, article first, § 8.[10] The trial court granted the defendant's motion to dismiss, concluding that retroactive application of *Vakilzaden* would violate the defendant's right to fair notice under the federal and state due process clauses. This appeal followed.[11]

As a preliminary matter, we set forth the standard of review.[12] It is well established that when a "defendant's

---

[8] The constitution of the United States, article one, § 10, provides in relevant part: "No State shall . . . pass any . . . ex post facto Law . . . ."

[9] The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "[N]or shall any State deprive any person of life, liberty or property, without due process of law . . . ."

[10] The constitution of Connecticut, article first, § 8, provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

[11] "The [defendant's brief fails] to indicate whether, [for the purposes of the present appeal, he is relying] upon the due process clause of the federal constitution, the state constitution, or both. To the extent that the defendant [is relying] upon his state constitutional right to due process of law; Conn. Const., art. I, § 8; we decline to review the claim because there has been no independent analysis of the state constitutional issue . . . [and] [w]e have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue. . . . We therefore regard the defendant's claim as arising under the fourteenth amendment to the United States constitution, § 1 . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Sinvil*, 270 Conn. 516, 518 n.1, 853 A.2d 105 (2004).

[12] "It is well settled that when reviewing a motion to dismiss a criminal information, we are required to assess the facts in the light most favorable to the state." *State* v. *Vakilzaden*, supra, 251 Conn. 660.

claims involve a question of law, we review them de novo." *State* v. *Kelly*, 256 Conn. 23, 31 n.6, 770 A.2d 908 (2001). The issue of whether the defendant's constitutional rights to fair notice were violated in the present case is a question of law; accordingly, our review is de novo.

The state claims that the trial court improperly granted the defendant's motion to dismiss because he had fair notice that his conduct was prohibited at the time that he engaged in it. Specifically, the state contends that the trial court improperly concluded that: (1) *Vakilzaden* announced a new construction of the custodial interference statutes by overruling *Marshak*; (2) this court's decision in *Vakilzaden* to overrule *Marshak* was unexpected and indefensible in light of existing law; and (3) the defendant could not have known his conduct to be unlawful. Because we conclude that the present case is readily distinguishable from *Marshak*, and the custodial interference statutes, standing alone, gave the defendant fair notice of the illegality of his conduct, we reverse the judgment of the trial court.

All of the state's claims distill to a single, dispositive issue in this appeal, namely, whether the defendant had fair notice that his alleged acts of custodial interference were prohibited by law. "The underlying principle [of fair notice] is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." (Internal quotation marks omitted.) *Bouie* v. *Columbia*, 378 U.S. 347, 351, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964). "[T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States* v. *Lanier*, 520 U.S. 259, 267, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997).

I

## WHETHER GENERAL STATUTES §§ 53a-97 AND 53a-98, STANDING ALONE, GAVE THE DEFENDANT FAIR NOTICE THAT HIS CONDUCT WAS PROHIBITED

We begin by examining the text of §§ 53a-97 and 53a-98, standing alone, to determine whether they "made it reasonably clear at the relevant time that the defendant's conduct was criminal." Id.[13] Section 53a-98 (a) (1) provides that a person is guilty of custodial interference in the second degree when "[b]eing a relative of a child who is less than sixteen years old and intending to hold such child permanently or for a protracted period and knowing that he has no legal right to do so, he takes or entices such child from his lawful custodian . . . ." Section 53a-97 (a) (2) makes such conduct a first degree class D felony when it is committed "by taking, enticing or detaining the child or person out of this state." The language of these statutes clearly encompasses Fabriz' conduct because he: (1) was the father of a one and one-half year old child; (2) intended to hold her for a protracted period of time; (3) knew that he had no right to do so under the court's order of supervised visitation;[14] and (4) took her out of the

---

[13] We note that the defendant does not argue that he was misled by the statutes standing alone. In fact, he concedes that, in light of *Vakilzaden*, §§ 53a-97 and 53a-98 permit joint custodians of a child to be guilty of custodial interference. His primary argument on appeal is that the statutes, as construed by *Marshak*, deprived him of fair notice at the time of his alleged criminal conduct.

[14] The defendant correctly points out that: (1) engaging in *wrongful* conduct is not necessarily tantamount to engaging in *unlawful* conduct; and (2) knowingly violating a court order of visitation is not the same thing as knowingly violating custodial interference statutes. In the present case, however, all the defendant needed to know for liability to attach under § 53a-97 was that Fabriz had no legal right to take Saba for a protracted period of time. The trial court's limited supervised visitation order made the extent of Fabriz' entitlement to Saba, and therefore the illegality of his actions, quite clear. Accordingly, any contention that the defendant did not know that he was acting contrary to the language of the statute is without merit.

United States to another country. Because this conduct falls within the ambit of activities proscribed by the statutes, and the defendant allegedly conspired with and aided Fabriz in accomplishing these acts of custodial interference, the statutes, standing alone, made it reasonably clear that the defendant's conduct was criminal at the time that he acted. Accordingly, the text of the statutes themselves provided the defendant with fair notice.

Moreover, the *Lanier* test for fair notice is expressed in the disjunctive.[15] See *State* v. *Vickers*, 260 Conn. 219, 230–31, 796 A.2d 502 (2002) (relying on first prong of *Lanier* test for conclusion that defendant had fair warning). For example, in *Johnson* v. *Collins Entertainment Co.*, 349 S.C. 613, 625–26, 564 S.E.2d 653 (2002), the defendants claimed that they were deprived of fair warning regarding the illegality of operating video poker machines that offered jackpots in excess of $125 because the relevant statute concerning limitations on advertising such machines; S.C. Code Ann. § 12-21-2804 (B) (West 2000); was unclear, and the only case construing the statute to include similar conduct was published after they had pursued their criminal actions. The South Carolina Supreme Court, however, held that a previous decision "did not announce a novel interpretation of [S.C. Code Ann. § 12-21-2804 (B)] since the *language of the statute* gave sufficient notice to defendants that their conduct . . . could be considered a 'special inducement.'" (Emphasis added.) *Johnson* v. *Collins Entertainment Co.*, supra, 626. Therefore, the fact that §§ 53a-97 and 53a-98, standing alone, provided the

---

[15] See *Leonard* v. *Commissioner of Revenue Services*, 264 Conn. 286, 300, 823 A.2d 1184 (2003) (interpreting use of "or" in statute to be disjunctive, making clauses separated by it independent and equal in weight); *Flint* v. *Universal Machine Co.*, 238 Conn. 637, 645, 679 A.2d 929 (1996) (interpreting " 'the use of the disjunctive conjunction "or" [in an insurance contract as] unambiguously requir[ing] that either of the exclusions separated by the conjunction, if applicable, excludes coverage' ").

defendant with fair notice of the illegality of his conduct is sufficient to reverse the judgment of the trial court. The only question that remains is whether *Marshak*'s treatment of the statutes undermines that determination.

## II

## WHETHER *MARSHAK*'S TREATMENT OF §§ 53a-97 AND 53a-98 LIKEWISE MADE IT REASONABLY CLEAR THAT THE DEFENDANT'S CONDUCT WAS ILLEGAL

The state claims that: (1) this court did not construe the custodial interference statutes, §§ 53a-97 and 53a-98, in *Marshak*; (2) even if it had, *Marshak* is not controlling in the present case because it is factually distinct; and (3) even if *Marshak* were controlling, the defendant should have known, on the basis of the statutes themselves and the interpretations of similar statutes by the courts of other states, that this court would overrule it. The defendant claims in response that: (1) *Marshak did* construe the custodial interference statutes; (2) *Marshak is* controlling because its holding explicitly prohibited custodial interference liability for legal custodians, and in the present case, Fabriz had legal, if not physical, custody of his daughter at the time of the incident; and (3) it is unreasonable to expect individuals to anticipate that case law will be overturned. Because we conclude that *Marshak* is factually distinct from the present case and therefore not controlling, we need not address the state's other contentions.

In *Marshak* v. *Marshak*, supra, 226 Conn. 661–63, this court was asked to recognize a tort of child abduction or custodial interference. The defendant in that case had helped the husband of a married, American couple to abduct his children and take them overseas to Israel, Brazil and elsewhere. Id., 655–59. At the time of the incident, the couple was married, no dissolution action

had been initiated, and both parents enjoyed joint legal and physical custody of their four children. Id., 654–55; see General Statutes § 45a-606. In light of these facts, we declined to recognize a tort of custodial interference because the fact that the father had not "been stripped of *any legal entitlement* to custody of the children [at the time of the incident was] fatal to the [mother's] claim." (Emphasis added.) *Marshak* v. *Marshak*, supra, 667–68. Our decision was predicated on the notion that unlawful custody is a necessary factual predicate to child abduction, and because there was joint as opposed to sole custody, there could be no unlawful custody.

Subsequently, in *State* v. *Vakilzaden*, supra, 251 Conn. 660, we concluded that "*Marshak* may be distinguishable from the present case on the ground that a court order permitting only limited, supervised visitation between a father and a child satisfies the sole custody requirement of *Marshak*."[16] Additionally, we took the opportunity to reexamine our holding in *Marshak* and concluded that the legal premise in *Marshak*, which immunized legal custodians from the possibility of liability for such a tort, was faulty. Id., 662–63. Accordingly, we determined that *Marshak* must be overruled, thereby opening the door for future liability for joint custodians, as well as those who conspire with them. Id., 662.

Unlike in *Marshak*, in the present case Mirjavadi already had initiated dissolution proceedings and had obtained a visitation order respecting Saba prior to

---

[16] The defendant argues that this court's use of "may" instead of "is" in its statement in *State* v. *Vakilzaden*, supra, 251 Conn. 660, that the present case "may" be distinguishable from *Marshak* implies equally that it may not be distinguishable. The defendant ignores, however, this court's statement in the very next paragraph, that we *could* have reversed the trial court's judgment on this ground alone; we simply decided not to stop there. Id. Read in the context of the complete decision, it is clear that the use of the word "may" served to highlight two, mutually exclusive grounds for reversal.

the incident of child abduction. That visitation order, granting Fabriz three hours of supervised visitation with his daughter per week,[17] in effect, stripped Fabriz of physical custody of Saba,[18] which previously had been one of his legal entitlements as a husband and father. Therefore, the present case is materially distinct from *Marshak* because Fabriz was not a joint custodian as envisioned by this court in *Marshak*;[19] the facts of the present case simply fall outside of its holding.

[17] The signed agreement in the file suggests that Fabriz and Mirjavadi initially agreed to five hours of supervised visitation per week at 49 Willard Terrace in Stamford, in the presence of Zak Mirjavadi, Agam Mirjavadi and the defendant. It appears that this agreement was modified in practice, allowing for longer periods of visitation. The actual amount of time allowed, however, is irrelevant, because it does not change the very limited, supervised nature of Fabriz' visitation order, which is of utmost significance to the issue of whether he had physical custody of Saba.

[18] The defendant correctly points out that there is no Connecticut case law explicitly construing a limited visitation order as being equivalent to an order of sole custody. This is due, in large part, to the unusual circumstances of the present case. Typically, visitation orders are not obtained independently of orders of temporary custody; see A. Rutkin, K. Hogan & S. Oldham, 8 Connecticut Practice Series: Family Law and Practice (2d Ed. 2000) § 41.1, pp. 455–56; and they only remain in effect until a final custody order is entered, which often happens along with a dissolution order. See id., § 42.15, pp. 490–91. In the present case, however, Fabriz never asked for physical custody of Saba; instead, he sought visitation because, as he admitted, he "ha[d] not seen the child, been permitted to see the child, in four months," as she was residing with Mirjavadi. The fact that the trial court ultimately awarded Fabriz very limited, supervised visitation necessarily implies that Mirjavadi had received de facto sole physical custody. See footnote 5 of this opinion.

[19] The defendant claims that "[i]t beggars common sense to suggest that [he] should be held to have understood, prior to *Vakilzaden*, that the 'joint custodian' whom the *Marshak* court held immune from charges of custodian interference actually referred only to the subset of joint custodians whose custody was unqualified by an order providing for or limiting visitation." The holding of *Marshak*, however, clearly attributes the defendant's immunity from liability to the father's status as a joint custodian, which it defines as "[t]he absence of a specific finding by the trial court that . . . the father had been stripped of any legal entitlement to custody of the children . . . ." *Marshak* v. *Marshak*, supra, 226 Conn. 667–68. Viewing the facts, as we must, in a light favorable to the state, the defendant in the present case was fully aware that the court-ordered supervised visitation arrangement

Moreover, because we did not construe those statutes in light of the holding of that case, this court's references to §§ 53a-97 and 53a-98 in *Marshak* were dicta. They were included for the purpose of explaining the trial court's holding, recognizing a civil tort of child abduction, which we proceeded to reverse. Specifically, we stated in *Marshak* that we could not hold the nonparent defendant civilly liable for child abduction because "although a duty to a custodial parent may be inferred from §§ 53a-97 and 53a-98 of the penal code, the breach of such a duty would take place only if the alleged abductor in fact knows that he has no 'legal right' to the child's custody." *Marshak* v. *Marshak*, supra, 226 Conn. 666. The father in *Marshak* had unabridged joint legal and physical custody of his children as a result of his ongoing marital relationship, in which the court had not yet been asked to intervene. Id., 667. By contrast, in the present case, the court-ordered visitation made it clear that Fabriz did not have a legal right to physical custody of Saba beyond the weekly supervised visitation. See footnote 14 of this opinion. Accordingly, the defendant's reliance on *Marshak* in support of his claim that his constitutional right to fair notice was violated is without merit.

The judgment is reversed and the case is remanded for further proceedings according to law.

In this opinion the other justices concurred.

---

between Fabriz and Mirjavadi stripped Fabriz of his legal entitlement to joint physical custody of Saba. As we conclude that the holding in *Marshak* was clear, the defendant cannot now rely on its ambiguity as a defense.