LEYLA MIRJAVADI ET AL. *v.* ANTHONY
VAKILZADEH ET AL.
(AC 30608)

Bishop, Lavine and Bear, Js.

Argued September 24, 2010—officially released April 19, 2011

*Brenden P. Leydon,* for the appellant (named plaintiff).

*Lloyd D. Pedersen,* with whom, on the brief, was *Catherine A. Stewart,* for the appellee (defendant Maria Varone).

*Opinion*

LAVINE, J. The plaintiff, Leyla Mirjavadi,[1] appeals from the judgment of the trial court, rendered after a trial to the court, in favor of the defendant Maria Varone.[2] The plaintiff claims that the trial court made erroneous factual findings in determining that the defendant was not negligent when the plaintiff's daughter, Saba Fabriz (Saba), was abducted by the daughter's father

---

[1] Mirjavadi brought this action individually and as the next friend of her daughter, Saba Fabriz. Mirjavadi, however, is the only party to this appeal and we refer to her as the plaintiff in this opinion.

[2] In addition to Varone, the plaintiff named as defendants Anthony Vakilzadeh, Barbara Green and Green & Gross, P.C. The plaintiff withdrew her complaint as to Vakilzadeh, Green and Green & Gross, P.C., after the trial began.

during a visit supervised by the defendant. We agree that some of the underlying facts found by the court were clearly erroneous and conclude that the erroneous findings undermine our confidence in the court's fact-finding process and its decision. Accordingly, we reverse the judgment of the trial court and remand the case for a new trial.

The following facts and procedural history in this disturbing matter are relevant to the plaintiff's appeal. The plaintiff and Orang Fabriz were Iranian citizens, married to one another, who came to the United States in 1995 with Saba to visit relatives. While in the United States, the plaintiff filed for divorce from Fabriz and was granted political asylum. The plaintiff was represented by attorney Barbara Green during the divorce proceedings.

While the divorce was pending, Fabriz was granted visitation rights with respect to Saba. It was agreed, however, that these visits would be supervised at all times. Initially, the supervised visitations occurred at the house of the plaintiff's brother, Zach, but the location had to be moved due to outbursts by Fabriz. After one visit was held at the Stamford police station, the plaintiff and Fabriz agreed to hold visits at the office of a family therapist, Barbara Ivler. Eventually, because these visits were successful, Ivler recommended that the visits occur in a more natural setting. To facilitate visitation outside Ivler's office, the plaintiff, upon Green's recommendation, hired the defendant to supervise them.

On October 5, 1996, the defendant supervised an afternoon visit between Fabriz and Saba scheduled to last from 2 until 5 p.m. at the Stamford Town Center mall.[3] As was the usual practice, the plaintiff took Saba

---

[3] The defendant began supervising visits on July 20, 1996, and the location of the visits shifted from a public library, to a Stamford nature center and finally to the mall.

to the mall and left her with the defendant for the visit. Also, as had become the usual practice, the uncle of both the plaintiff and Fabriz, Anthony Vakilzadeh,[4] was present to participate in the visit.[5]

At the beginning of the visit, the defendant accompanied Fabriz, Saba and Vakilzadeh to a restaurant in the mall. Soon after entering the restaurant, Fabriz left with Saba and went to a bookstore across from the restaurant. When the defendant could not locate Fabriz and Saba in the bookstore, Vakilzadeh told her that Fabriz may be shopping with Saba for a coat or that he may be resting somewhere because he had not been feeling well that day. Vakilzadeh later that day told the defendant that, according to his wife, Fabriz had left the mall to go to Washington, D.C., for legal advice.

Unbeknownst to the defendant, prior to the October 5, 1996 visit, Vakilzadeh had purchased two airplane tickets to Turkey for Fabriz and Saba. Additionally, Fabriz had arranged, using Vakilzadeh's credit card, for a limousine to transport him to the mall on October 5, 1996, and then to take him and Saba to John F. Kennedy International Airport (JFK airport).[6] The police later determined that Fabriz and Saba had left the United States on a 6 p.m. flight on October 5, 1996, from JFK airport to Istanbul, Turkey. The plaintiff has not seen Saba since October 5, 1996, and has not received any communication from her during this period of nearly fifteen years.

The plaintiff commenced this action on July 14, 1998. Once the plaintiff withdrew her complaint as to Vakilzadeh, Green and Green & Gross, P.C.; see footnote 2 of

---

[4] In the related criminal case, Anthony Vakilzadeh's name is spelled "Vakilzaden." See State v. Vakilzaden, 272 Conn. 762, 865 A.2d 1155 (2005); State v. Vakilzaden, 251 Conn. 656, 742 A.2d 767 (1999) (en banc).

[5] The plaintiff and Fabriz are also cousins. They became husband and wife as a result of an arranged marriage.

[6] Previously, Vakilzadeh had driven Fabriz to and from his visits with Saba.

this opinion; the court ultimately was asked to determine liability only as to the defendant for negligence and breach of fiduciary duty.[7] Specifically, the plaintiff alleged that the abduction was caused by the defendant's negligence and carelessness because she had failed to supervise the visitation properly in order to prevent Saba from being kidnapped; she had failed to report the kidnapping immediately to any authority or to the plaintiff; she had misrepresented the time the kidnapping occurred; she had failed to ensure that Fabriz did not have his passport during a supervised visitation; she had failed to prevent the kidnapping; she had failed to keep a proper lookout for Saba; she had been inattentive to her duties during the visit; and she had permitted Fabriz to be with Saba unsupervised.

At the conclusion of trial, the court found in favor of the defendant, stating that "[e]ach time a liability exposition has been attempted in draft by the court, its elements appear shaky, not cumulative, and hugely overwhelmed by the superseding intentional (and criminal) conduct of . . . Fabriz and . . . Vakilzadeh coupled with the uncertainty of the sporadic and vague information [the defendant] was provided along the continuum of the ongoing divorce." In reaching its decision, the court made certain factual findings that are the subject of this appeal.

Concerning the time of the abduction, the court was uncertain when Fabriz and Saba left the company of

---

[7] This case was delayed for several years because Vakilzadeh was criminally prosecuted. See State v. Vakilzaden, 272 Conn. 762, 865 A.2d 1155 (2005) (reversing judgment of dismissal); State v. Vakilzaden, 251 Conn. 656, 742 A.2d 767 (1999) (en banc) (reversing judgment of dismissal). Following his second appeal, Vakilzadeh entered a guilty plea to one count of custodial interference in the first degree in violation of General Statutes § 53a-97 (a) (2), one count of conspiracy to commit custodial interference in the first degree in violation of General Statutes §§ 53a-48 and 53a-97 (a) (2) and one count of hindering prosecution in the second degree in violation of General Statutes (Rev. to 1995) § 53a-167 (a) and was sentenced to two years in prison. He served nine months before being released.

the defendant and Vakilzadeh but found that it was "probably between approximately 2:15 and after 4 p.m." The court credited the testimony of the defendant and found that the defendant could have concluded that Fabriz had absconded with Saba after 3 p.m.

The court also considered the defendant's state of mind concerning the risk of abduction. Specifically, it found that the defendant was not negligent in thinking that Fabriz could not leave the country because, to her knowledge, he did not have a passport and, if such a belief was unjustified, it was Green's responsibility to have notified the defendant.[8] Additionally, the court stated that an agreement between the parties, which permitted a certain named law student to substitute as a supervisor if the defendant became unavailable, was inconsistent with a high degree of fear concerning risk of abduction. In an articulation concerning the court's evaluation as to the purpose of the supervised visitation, the court stated that the defendant's role as a supervisor as of October 5, 1996, had become "rather routinized," similar to the role someone might play in visitation situations in which abduction is not a risk.

On January 14, 2010, pursuant to an order by this court, the court rendered an articulation concerning its findings as to the purposes for which the plaintiff hired the defendant and for the supervised visits in general.[9]

---

[8] Green testified that she had sent Fabriz' passport to the Pakistan Embassy after removing pages containing the plaintiff's picture and Saba's name from it. Although Fabriz had an Iranian passport, certain matters concerning Iranian nationals are handled through the Pakistan Embassy because the United States does not have diplomatic relations with Iran.

[9] The court issued two articulations in this case. As noted, the court issued its first articulation on January 14, 2010, and provided answers to two questions concerning whether the court concluded that the purpose of the supervised visitations was a concern of a risk of abduction and what the court concluded were the purposes underlying the decision to hire the defendant. The court issued the second articulation on December 21, 2010. The court addressed whether it considered the defendant's failure to keep Saba in her sight amounted to negligent failure to supervise, whether the conduct of Vakilzadeh and Fabriz constituted a superseding cause that

The court concluded that the goal for the supervision was "at least in part, motivated by the perception that a person ought to be in place against the prospect that the father might try to return to Iran with the child." The court further concluded that "it appeared to the attorney representing the child's mother that there was a risk that the father might flee to Iran, and with that in mind, she hired [the defendant] whose limited prior such supervision included an instance where [the defendant] physically stopped or thwarted an attempted abduction. However, by the time of October 5, 1996, this concern had been allowed to wither, in multiple ways."

The plaintiff now seeks a new trial, claiming that three of the court's factual determinations were unsupported by the evidence at trial and were clearly erroneous. Specifically, the plaintiff claims that the court (1) erred in finding that the abduction could have occurred as late as after 4 p.m., (2) erred in finding that the parties agreed to allow a law student to serve as a substitute supervisor for visitations if the defendant was unavailable and (3) erroneously minimized the defendant's initial purpose in supervising the visitations. We agree with the plaintiff that some of the court's factual findings were erroneous and, accordingly, remand the case for a new trial.

We begin our analysis by setting forth the proper standard of review. "To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

---

absolved the defendant of any liability and whether it concluded that it was foreseeable to the defendant that Fabriz might attempt to abduct Saba.

(Internal quotation marks omitted.) *Misthopoulos* v. *Misthopoulos*, 297 Conn. 358, 377, 999 A.2d 721 (2010).

"Where . . . some of the facts found are clearly erroneous and others are supported by the evidence, we must examine the clearly erroneous findings to see whether they were harmless, not only in isolation, but also taken as a whole. . . . If, when taken as a whole, they undermine appellate confidence in the court's fact finding process, a new hearing is required." (Internal quotation marks omitted.) *Lambert* v. *Donahue*, 78 Conn. App. 493, 507, 827 A.2d 729 (2003).

The plaintiff's first challenge relates to her allegation that the defendant failed to report the abduction in a timely manner. Specifically, the plaintiff challenges the court's finding that Fabriz could have absconded with Saba as late as after 4 p.m. In reaching this conclusion, the court credited the testimony of the defendant over the testimony of other witnesses, such as Vakilzadeh. Although "it is the exclusive province of the trier of fact to weigh the conflicting evidence"; (internal quotation marks omitted) *LPP Mortgage, Ltd.* v. *Lynch*, 122 Conn. App. 686, 700, 1 A.3d 157 (2010); we agree with the plaintiff that the evidence does not support a factual finding that the abduction could have occurred that late in the day.

According to the defendant's testimony, the plaintiff arrived at the mall around 5 p.m. and called the police when she was informed that Saba was missing. The defendant then went to the police station to meet with Detective James McAuliffe, who was involved in the investigation surrounding Saba's abduction. When she arrived at the police station, the defendant noted that McAuliffe already had typed up some information about the sequence of events surrounding the abduction of Saba, which later was included in the affidavit in support of the arrest warrant for Vakilzadeh and presented

at trial. Specifically, the defendant testified that the paper McAuliffe showed her said something about 4:15 and 4:30.[10] In response, the defendant told McAuliffe that it was at least 4:15 p.m. when the abduction occurred, but that she had not been wearing a watch that day. During her testimony at trial, the defendant explained that when she told the police that it was at least 4:15 p.m. when Fabriz took Saba, she did not mean it was later than 4:15 p.m., but that they already were gone *by* 4:15 p.m.[11]

Indeed, the defendant would not have personally known if Saba was abducted after 4 p.m. because she testified that she last saw Saba and Fabriz twenty to twenty-five minutes after 2 p.m. when the visit commenced. Specifically, she testified that twenty to twenty-five minutes after the 2 p.m. visit had began, Fabriz and Saba went into the bookstore across from the restaurant. The defendant believed that the two were in the bookstore but testified that she was not certain because she could not see the children's section from where she was sitting. After an additional fifteen to twenty minutes from the time Saba and Fabriz left the restaurant, the defendant could not find either of them in the bookstore.[12] Therefore, we conclude that

---

[10] The record does not indicate what this time period was referencing.

[11] The transcript provides in relevant part:

"[The Defendant's Counsel]: When you said it was at least 4:15, what were you trying to describe?

"[The Defendant]: Well, that it was at least 4:15 that they were already gone. . . .

"[The Defendant's Counsel]: So, you weren't saying that it was at least 4:15 or maybe later when—

"[The Defendant]: Oh, no. . . .

"[The Defendant's Counsel]: What were you trying to describe when you said it was at least 4:15?

"[The Defendant]: That it had happened already prior to 4:15."

[12] The affidavit supporting the arrest warrant for Vakilzadeh also noted that the limousine driver, Ahmed Ismail, told the police that he drove Fabriz and a young child from the Stamford mall to JFK airport. The driver stated that he dropped them both off at JFK at 3:15 p.m.

the record does not support a finding that the abduction took place as late as after 4 p.m.

We also conclude that this error was harmful and undermines our confidence in the trial court's finding of no negligence because it leads us to conclude that the court's analysis of the specification of negligence relating to the delay in reporting the abduction was seriously flawed. The court did not specifically address the specification of negligence relating to the delay in reporting; however, the timing sequence was, of necessity, central to a proper analysis of this issue.

The plaintiff's next two arguments relate to her allegation that the defendant failed to supervise the visit properly. First, she argues that the evidence does not support a finding that the parties had agreed that a certain named law student would substitute as a supervisor for the visits if the defendant were unavailable. Although the record reveals that a substitute for the defendant was discussed by the parties, we agree that the evidence does not support the conclusion that the parties ever reached an agreement.

Green testified that she and Fabriz' attorney prepared a draft agreement to establish the parameters of the supervised visitations with the defendant. The draft agreement contemplated that a certain named law student would serve as a substitute if the defendant were unavailable to supervise a particular visitation. Green noted twice during her testimony, however, that this agreement was never executed. The defendant also testified that she had reviewed the draft agreement and suggested changes but testified that neither the original agreement nor the one containing her suggested changes was ever executed. The defendant added that, while on vacation during the period in which she was employed by the plaintiff, Green called her because the

plaintiff did not want a substitute to supervise but rather wanted the defendant.

The evidence supports a finding that the parties seriously considered a substitute for the defendant, but both Green and the defendant testified that a written agreement was never executed. The evidence also shows that the plaintiff rejected the idea that a substitute could fill in for the defendant while she was on vacation. We conclude that the evidence does not support the finding that the parties agreed that a certain named law student would serve as a substitute for the defendant, if the defendant were unavailable for a particular visit.

Furthermore, we conclude that this error was harmful because it affected the court's finding that the abduction was not foreseeable. The court stated "that the parties to the ongoing divorce agreed that, should [the defendant] be unavailable for a visitation session, a certain named law student would stand in. *This can also be seen as inconsistent with a high degree of fear of . . . Fabriz leaving the country, for no one, so far as the evidence showed, delivered cautionary instructions to said law student.*" (Emphasis added.) This finding by the court indicates that the court failed to fully appreciate the ongoing risk of abduction. That is because the court mistakenly assumed that the certain named law student, who it concluded had not been informed about the risk of abduction, was competent to perform the job of supervising the visitation and that the parties had agreed that the law student would serve as a substitute for the defendant.

Next, the plaintiff argues that the court erroneously minimized the defendant's initial purpose in supervising visitations, which, according to the plaintiff, was to prevent abduction. Specifically, the plaintiff argues that while the court recognized that one of the purposes of

the supervised visits was to prevent abduction, it greatly minimized that purpose in finding that the defendant was not negligent. We conclude that while the plaintiff couches her claim in terms of an erroneous factual finding, and the defendant accepts that characterization, the court's determination of the emphasis to be placed on the purposes of the supervised visitations is actually more akin to a legal conclusion and, therefore, our review is plenary. See *Location Realty, Inc.* v. *Colaccino*, 287 Conn. 706, 717, 949 A.2d 1189 (2008) ("[t]o the extent that we are required to review conclusions of law . . . by the trial court, we engage in plenary review").

While the court's finding as to the purposes behind the supervised visitation was a factual finding, the court's conclusion concerning how much weight to assign to each purpose was a legal conclusion. The court's conclusion as to the purposes was part of its determination of whether the abduction was foreseeable and its evaluation of the scope of the legal duty that the defendant owed to the plaintiff,[13] whether the

---

[13] We note, however, that that the court failed to make a finding as to the scope of the defendant's duty. "The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury. . . . [T]he existence of a duty of care is an essential element of negligence. . . . A duty to use care may arise from a contract, from a statute, or from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act." (Citations omitted; internal quotation marks omitted.) *Sturm* v. *Harb Development, LLC*, 298 Conn. 124, 139–40, 2 A.3d 859 (2010).

"The test for determining legal duty is a two-pronged analysis that includes: (1) a determination of foreseeability; and (2) public policy analysis. . . . Duty is a legal conclusion about relationships between individuals, made after the fact, and imperative to a negligence cause of action. . . . The ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised. . . . [In other words], would the ordinary [person] in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result? . . . Foreseeability notwithstanding, it is well established that Connecticut courts will not impose a duty of care

defendant's actions were the proximate cause of the abduction and whether Fabriz' and Vakilzadeh's conduct constituted a superseding cause. The court erred in concluding that because the circumstances surrounding the visitations seemingly had changed, that vitiated the obligation of the defendant to continue to ensure that no abduction occurred. Although we do not express an opinion as to whether the abduction was foreseeable on October 5, 1996, we do conclude that the court's error indicates a misunderstanding of what foreseeability is under our law and that this flawed analysis, in combination with the two clearly erroneous findings, undermines our confidence in the court's conclusion that the defendant was not negligent.

As noted, the determination of whether an event was foreseeable is an essential part in an analysis of proximate cause. "Cause in fact, occasionally referred to as actual cause, asks whether the defendant's conduct caused the plaintiff's injury. Thus, if the plaintiff's injury would not have occurred but for the defendant's conduct, then the defendant's conduct is a cause in fact of the plaintiff's injury. Conversely, if the plaintiff's injury would have occurred regardless of the defendant's conduct, then the defendant's conduct was not a cause in fact of the plaintiff's injury. . . . Lines must be drawn determining how far down the causal continuum individuals will be held liable for the consequences of their

on the defendants if doing so would be inconsistent with public policy." (Citations omitted; internal quotation marks omitted.) *Monk* v. *Temple George Associates, LLC*, 273 Conn. 108, 114–16, 869 A.2d 179 (2005).

The trial court released its memorandum of decision on June 19, 2008, and at no point did the court provide an analysis as to the scope of the defendant's duty to supervise Saba. It is unclear to us how the court could determine whether or not the defendant was negligent on October 5, 1996, without first reaching a conclusion as to the duty the defendant owed to the plaintiff. See *Lodge* v. *Arett Sales Corp.*, 246 Conn. 563, 571, 717 A.2d 215 (1998) ("[t]he determination of whether a duty exists between individuals is a question of law" [internal quotation marks omitted]).

actions. . . . This line is termed proximate cause. Proximate cause establishes a reasonable connection between an act or omission of a defendant and the harm suffered by a plaintiff. . . . Proximate cause serves to [temper] the expansive view of causation [in fact] . . . by the pragmatic . . . shaping [of] rules which are feasible to administer, and yield a workable degree of certainty. . . . This court has defined proximate cause, as [a]n *actual cause* that is a *substantial factor* in the resulting harm . . . ." (Citations omitted; emphasis in the original; internal quotation marks omitted.) *Stewart* v. *Federated Dept. Stores, Inc.*, 234 Conn. 597, 605–606, 662 A.2d 753 (1995). "The question to be asked in ascertaining whether proximate cause exists is whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's act." (Internal quotation marks omitted.) *Artie's Auto Body, Inc.* v. *Hartford Fire Ins. Co.*, 287 Conn. 208, 218, 947 A.2d 320 (2008).

The determination of whether an event was foreseeable is also an essential part in an analysis of superseding cause. The doctrine of superseding cause has been abolished by our Supreme Court "in cases . . . wherein a defendant claims that its tortious conduct is superseded by a subsequent negligent act or there are multiple acts of negligence." (Internal quotation marks omitted.) *Sullivan* v. *Metro-North Commuter Railroad Co.*, 292 Conn. 150, 167, 971 A.2d 676 (2009). Our Supreme Court, however, has concluded that abolishing the doctrine "does not necessarily affect those cases where the defendant claims that an *unforeseeable* intentional tort, force of nature, or criminal event supersedes its tortious conduct." (Emphasis added; internal quotation marks omitted.) Id.

While the trial court properly addressed the issue of foreseeability in its analysis of whether the defendant's conduct was a proximate cause of the abduction and

whether the conduct of Vakilzadeh and Fabriz constituted a superseding cause, we conclude that the court mistakenly conflated the *foreseeability* of the abduction with the *seemingly diminished probability* that it would occur. The Restatement (Second) of Torts § 435 provides: "(1) If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable. (2) The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm." 2 Restatement (Second), Torts, Legal Cause § 435, p. 449 (1965). Comment (b) to this section also provides: "[I]f the actor should have realized that his conduct might cause harm to another in substantially the manner in which it is brought about, the harm is universally regarded as the legal consequence of the actor's negligence. This is true not only when the conduct is negligent because of the probability that it will bring about harm in this particular manner, but also when the probability that the harm will thus result to another, though realizable by the actor, is not so great as of itself to make the actor's conduct unreasonably dangerous." Id., comment (b), pp. 451–52. The term "improbable," conversely, is understood to mean "unlikely . . . to occur." Webster's Third New International Dictionary (1961).

We also note that "[o]ur threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. . . . By that is not meant that one charged with negligence must be found actually to have foreseen the probability of harm or that the particular injury which resulted was foreseeable, but the test is, would the ordinary [person] in the

defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result? . . . The idea of risk in this context necessarily involves a recognizable danger, based upon some knowledge of the existing facts, and some reasonable belief that harm may possibly follow. . . . Accordingly, the fact finder must consider whether the defendant knew, or should have known, that the situation at hand would obviously and naturally, even though not necessarily, expose [a plaintiff] to probable injury unless preventive measures were taken." (Citations omitted; internal quotation marks omitted.) *LePage* v. *Horne*, 262 Conn. 116, 124, 809 A.2d 505 (2002).

In its memorandum of decision and its two responses to the articulations ordered by this court, the court clearly based its conclusions, to a significant degree, on a determination that an abduction on October 5, 1996, was improbable. In addressing the concern over the risk of abduction, the court stated that "by the time of October 5, 1996, this concern had been allowed to wither, in multiple ways. [The defendant] had been given to understand that the father no longer possessed the passport; the father was ostensibly to become employed in New Jersey, and the numerous visits preceding the fateful one had concluded rather without incident." In a subsequent articulation, the court stated that: "It may be however, instead of the passage of time always increasing the likelihood of foreseeability of an awful event, the sands can be shifting and the untoward event may shrink in sound viewing to where the reasonable prudent person is not rightly to be held. So here, one sees the unusual setting of the decreasing foreseeability of the tragic event as time and events wore on. Usually, of course, time illuminates."

We appreciate the extent to which the trial court struggled with the complexities of this case. But the

court's conclusion that the concern over possible abduction was "wither[ing]" and that, as a consequence, the *foreseeability* of abduction was "decreasing" is not supportable. The question is not whether the risk of abduction was low or had diminished over time, but whether it remained foreseeable that Saba could be abducted by her father. See *Lodge* v. *Arett Sales Corp.*, 246 Conn. 563, 572, 717 A.2d 215 (1998) (first step in analysis of whether duty exists and extent of such duty is to determine foreseeability of plaintiff's injury); see also id., 575–77. A decreased likelihood that an event will occur does not necessarily mean that it becomes unforeseeable. The basis of the court's conclusion that the defendant was not negligent and that the conduct of Vakilzadeh and Fabriz constituted a superseding cause, therefore, rests on a flawed analysis of the foreseeability of the abduction and cannot stand.

Our conclusion should not be read to suggest that the defendant's potential legal culpability can in any way be equated with that of Fabriz or Vakilzadeh. The relative responsibility of the parties is not before us. The tort claim against the defendant is in no way comparable to the deliberate, wilful and criminal conduct of those two wrongdoers. We decide only the issue presented—whether the court's factual errors undermine our confidence in its analysis and the result reached. We conclude that it does.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.